# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| RECURSION SOFTWARE, INC. § <br> § <br> § <br> v. § <br> § <br> § <br> DOUBLE-TAKE SOFTWARE, INC., f/k/a § <br> NSI SOFTWARE, INC., and NETWORK § <br> SPECIALISTS, INC. § | Case No. 4:10-CV-403 <br> Judge Clark/Judge Mazzant |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are Plaintiff Recursion Software, Inc.'s Second Sealed Motion to Exclude Expert Testimony of Judy Etchison (Dkt. #39), Plaintiff Recursion Software, Inc.'s Sealed Motion to Exclude Expert Testimony of Terry Lloyd (Dkt. #40), Defendant Double-Take Software, Inc.'s Sealed Motion to Exclude Expert Testimony of Barry L. Bell (Dkt. #44), and Defendant Double-Take Software, Inc.'s Sealed Motion to Exclude Expert Testimony of Peter M. Martin (Dkt. #45). Having considered the relevant pleadings and the responses thereto, the Court finds that Plaintiff's Motion to Exclude Expert Testimony of Judy Etchison (Dkt. #39) is denied, Plaintiff Motion to Exclude Expert Testimony of Terry Lloyd (Dkt. #40) is denied, Defendant's Motion to Exclude Expert Testimony of Barry L. Bell (Dkt. #44) is granted, and Defendant's Motion to Exclude Expert Testimony of Peter M. Martin (Dkt. #45) is granted in part and denied in part.

### BACKGROUND

On August 9, 2010, Plaintiff, Recursion Software, Inc. filed this lawsuit against Defendant, Double-Take Software, Inc., alleging breach of contract and copyright infringement of Plaintiff's product, which is identified by the parties as C++ Toolkits (Dkt. #1; Dkt. #42 at 2). ObjectSpace, Plaintiff's predecessor, introduced the Toolkits software in or around 1994 (Dkt. #49 at 5).

ObjectSpace and Recursion have developed a variety of different Toolkits that provide different functions. *Id*. On or about November 26, 1996, Network Specialists, Inc., Defendant's predecessor, purchased a copy of the Systems<Toolkit> ("Systems Toolkit") for the Windows platform, at a cost of $495.00, together with Support for the same product, at a cost of $375.00. (Dkt. #49 at 6; Dkt. #42 at 3). Approximately 10 days later, on December 6, 1996, ObjectSpace sent Network Specialists the Systems Toolkit Version 2.0 upgrades for the Windows and Solaris platforms. *Id*. Three years later, on or about April 28, 2000, Network Specialists purchased a copy of the Systems Toolkit Version 2.1 for the Solaris platform, at a cost of $597.00, together with Support for the same product, at a cost of $495.00. *Id*. These versions of the C++ Toolkits are accompanied by a "click-wrap" license agreement that the user is required to accept (Dkt. #42 at 3).

Defendant creates software that can be "used for real-time high availability and immediate disaster recovery" and was formerly known as both Network Specialists, Inc. and NSI Software, Inc. (Dkt. #49 at 7). Defendant's software is used to ensure that in times of high demand and in the event of disaster, the data stored on computers is available to companies that purchase the software. *Id*. Defendant's products have used the libraries or portions of the libraries from the C++ Toolkits since 2001. *Id*.

The Systems Toolkit Version 2.0 upgrades were accompanied by an agreement entitled "Software License and Warranty Agreement," which is the "click-wrap" license agreement mentioned above. *Id*. In addition, the Toolkits Software Version 2.1 upgrades were also accompanied by an agreement entitled "Software License Agreement." *Id*. These license agreements are at issue in the case, and contain identical language regarding the distribution of the C++ Toolkits. The parties dispute the scope of the license agreements, specifically, whether the

agreements allow the C++ Toolkits to be distributed by static linking.

The C++ Toolkits are used to create software using the C++ programming language, which groups program instructions into a "class," and stores the class in a file or files on disk (Dkt. #49 at 3; Dkt. #42 at 2). Classes can then be grouped into "class libraries" which promote the sharing and changing of code and data (Dkt. #49 at 3). The class libraries are grouped into "toolkits" that can be used and reused by software developers each time they want to use a specific function. *Id*. at 3-4. The instructions within class libraries are capable of being linked together either statically or dynamically. *Id*. at 4. "The software developer's 'source code' (human readable code) and other separate software modules are converted by a 'complier,' a program that validates and converts source code into machine language a computer can understand, namely 'object code.'" *Id*. A linking program links together the object code files to produce an executable file, which is the file that is loaded into a computer's memory and executed when the application is run. *Id*. "When a library is statically linked, the contents of a static library 'are embedded in an executable binary file at link time, which occurs as part of a build process.'" *Id*. A dynamic linked library "must be installed... on the end-user's computer, so that it is present at run-time." *Id*.

**PROCEDURAL HISTORY**

On January 27, 2012, Plaintiff filed its Second Sealed Motion to Exclude Expert Testimony of Judy Etchison (Dkt. #39). Defendant filed its response on February 16, 2012 (Dkt. #58). On February 27, 2012, Plaintiff filed its reply (Dkt. #67). Defendant filed its sur-reply on March 9, 2012 (Dkt. #76).

On January 27, 2012, Plaintiff filed its Motion to Exclude Expert Testimony of Terry Lloyd (Dkt. #40). Defendant filed its response on February 16, 2012 (Dkt. #57). On February 27, 2012,

3

Plaintiff filed its reply (Dkt. #66). Defendant filed its sur-reply on March 9, 2012 (Dkt. #75).

On January 27, 2012, Defendant filed its Motion to Exclude Expert Testimony of Barry L. Bell (Dkt. #44). Plaintiff filed its response on February 16, 2012 (Dkt. #54). On February 27, 2012, Defendant filed its reply (Dkt. #62). Plaintiff filed its sur-reply on March 8, 2012 (Dkt. #69).

On January 27, 2012, Defendant filed its Motion to Exclude Expert Testimony of Peter M. Martin (Dkt. #45). Plaintiff filed its response on February 16, 2012 (Dkt. #55). On February 27, 2012, Defendant filed its reply (Dkt. #63). Plaintiff filed its sur-reply on March 8, 2012 (Dkt. #70).

## LEGAL STANDARD

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-93 (1993), the Supreme Court instructed courts to function as gatekeepers and determine whether expert testimony should be presented to the jury. Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove by a preponderance of the evidence that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590-91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, in order to be admissible, expert testimony must be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

4

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exhaustive list of factors that courts may use in evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert,* 509 U.S. at 594.

The *Daubert* factors are not "a definitive checklist or test." *Daubert,* 509 U.S. at 593. As the Court has emphasized, the *Daubert* framework is "a flexible one." *Id*. at 594. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citation omitted).

## ANALYSIS

*A. Plaintiff Recursion Software, Inc.'s Second Sealed Motion to Exclude Expert Testimony of Judy Etchison (Dkt. #39)*

Plaintiff asserts that the Court should exclude two opinions made by Judy Etchison ("Etchison") on the basis that there is a large analytical gap between her opinions and the data upon which she relies (Dkt. #39 at 5). Plaintiff contends the analytical gap is so broad as to render her opinions unreliable. *Id*. First, Plaintiff contends the Court should exclude Etchison's opinion that the 2005 Versant agreement contains broader and less restrictive rights than those Defendant

exercised. Plaintiff argues that Etchison's report mentions three differences between the 2005 Versant agreement and the manner in which Double-Take used the C++ Toolkits at issue: (1) the 2005 Versant agreement is "a highly-specialized agreement for one particular product developed by Versant..."; (2) the 2005 Versant agreement required Versant's product to be used solely in collaboration with Plaintiff's product; and (3) the 2005 Versant agreement grants sublicensing of the C++ Toolkits (Dkt. #39 at 6-7). As to the first two differences, Plaintiff argues that Defendant's agreements were not limited in that manner, which would make Defendant's agreements broader than the 2005 Versant agreement. *Id*. at 7. Plaintiff contends that the third difference may make the 2005 Versant agreement broader, but Etchison failed to determine whether Defendant actually sublicensed the C++ Toolkits. *Id*.

Defendant asserts that Etchison explains in both her report and testimony that Versant was licensed to use several specified portions of the C++ Toolkits with its own software, and to sublicense the C++ Toolkits to software developers (Dkt. #58 at 1-2). Etchison confirms that because these rights were permitted to Versant and not to Defendant, the rights conferred under the agreement were broader. Defendant also contends that Plaintiff's arguments go to the weight and not the admissibility of Etchison's testimony.

Second, Plaintiff argues that the Court should exclude Etchison's opinion that the Vignette product is different from that which Defendant used (Dkt. #39 at 7). Plaintiff asserts that Etchison's opinion is unreliable because she does not identify the product used by Vignette and could not recall at her deposition why the products were different. *Id*. at 8. Defendant asserts that Etchison later clarified her opinion to explain that the licensing agreement as a whole was not describing the same thing as Defendant's licensing agreement (Dkt. #58 at 11).

The party offering the expert testimony has the burden of establishing by a preponderance of the evidence that the challenged testimony is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). It is not necessary for the proponent to prove that the expert's testimony is correct, but the proponent must prove the testimony is reliable. *Id*. "This being said, 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Allison v. NIBCO, Inc.*, No. 9:02-CV-172, 2003 WL 25685229, at *1 n.1 (E.D. Tex. May 21, 2003) (citing *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*.

The Court finds Etchison's two challenged opinions are admissible. The Court does not see a "profound analytical gap" in her opinions as asserted by Plaintiff. Etchison's opinion that the 2005 Versant agreement contains broader and less restrictive rights is further clarified in her deposition testimony. Etchison indicated that she was talking about both rights exercised by Defendant and rights conferred by the licensing agreement (Dkt. #39, Ex. D at 122:19-23). Further, when questioned about the limitations of Versant using only one product, Etchison testified that it was a restriction in one sense, but an expansion in another sense because it granted sublicensing of the Toolkits (Dkt. #39, Ex. D at 136:18-137:11). Etchison's second challenged opinion, that the Vignette product is different from the product used by Defendant, is also admissible. Etchison was stating her opinion that the Vignette agreement was fundamentally different from other agreements because they were using the technology in a completely different manner than Defendant. Etchison testified that, "[A]s I read the whole licensing agreement and looked at it and studied it, I drew the

conclusion that it was not talking about the same things that the license agreement that Double-Take was talking about" (Dkt. #39, Ex. D at 114:22-115:9). Etchison further explained that "maybe I should have said a different entity" (Dkt. #39, Ex. D at 116:18-117:13). Plaintiff may argue the weight of this testimony at trial through cross-examination, presentation of contrary evidence, and oral argument; however, the Court finds that Etchison's opinions are sufficiently reliable and admissible. Therefore, Plaintiff's Motion to Exclude Expert Testimony of Judy Etchison is denied.

B. *Plaintiff Recursion Software, Inc.'s Sealed Motion to Exclude Expert Testimony of Terry Lloyd (Dkt. #40)*

Plaintiff argues the Court should exclude the following two opinions of Defendant's expert Terry Lloyd ("Lloyd"): (1) that Plaintiff's agreements with other customers are not comparable for purposes of evaluating damages in this case; and (2) that Plaintiff's agreements with other customers authorized those customers to separately distribute Plaintiff's product (Dkt. #40 at 1-2). Plaintiff contends these arguments should be excluded because Lloyd lacks the evidence to support his opinion, and there is too great of an analytical gap between his opinion and the data he considered in forming that opinion. *Id.*

Defendant asserts that Lloyd was retained to rebut the testimony of Plaintiff's expert witness on damages. Moreover, Defendant contends that Lloyd's opinions are based on assumptions taken from a review of the expert report of Plaintiff's expert witness (Dkt. #57 at 1-2). Further, Defendant contends that any arguments regarding Lloyd's opinions should go to the weight of his testimony at trial, and not the admissibility. *Id.* at 12.

In order to be admissible, an expert's testimony must be (1) based on sufficient facts or data, (2) the product of reliable principles and methods, and (3) the principles and methods must be

8

reliably applied to the facts of the case. FED. R. EVID. 702. The purpose of Lloyd's expert report is to provide an opinion on the validity of Plaintiff's expert witness on damages, Barry L. Bell's ("Bell"), methodology and analysis used in his expert report. Using a summary of the agreements written by Bell, Lloyd concluded that the agreements referenced as comparables in the report are, in fact, not comparable in usage of or rights granted to Defendant (Dkt. #57, Ex.1 at 5). In his expert report, Bell states:

> In addition to the sales made under the standard license agreements, Recursion has also entered into a number of license agreements with customers who desired a broader rights grant than provided by the standard agreements. Some of these customers desired to increase the number of authorized users to platforms while others sought to obtain additional distribution rights. See Schedule 2. While each of these agreements has unique aspects that could impact the terms of the license agreements, including amounts payable to Recursion, they provide an indication of the terms and conditions under which Recursion would grant broader rights to its C++ Toolkit software. Further, these agreements also demonstrate what Recursion customers seeking broader rights to the software were willing to pay to Recursion for those additional rights.

(Dkt. #57, Ex. 8 at 9). Bell then goes on to describe several different licensing agreements entered into by Plaintiff and its other customers. After reviewing that portion of the report, Lloyd concluded that these agreements were not comparable to the licensing agreement at issue between Plaintiff and Defendant.

The Court finds that Lloyd's two opinions regarding whether Plaintiff's agreement with other customers are comparable for purposes of evaluating damages in this case, and whether Plaintiff's agreements with other customers authorized those customers to separately distribute Plaintiff's product, are sufficiently reliable and admissible to rebut Bell's expert testimony. Bell's report contains a detailed summary of the agreements as he interpreted them. Using Bell's report and the information contained therein, Lloyd determined that those agreements were not sufficiently

comparable for the purpose of calculating damages. As stated above, it is not necessary for Defendant to prove that the Lloyd's testimony is correct, but simply that the testimony is reliable. *Moore,* 151 F.3d at 276. Plaintiff may challenge the validity of Lloyd's opinions through cross-examination or the presentation of contrary evidence at trial. *Allison*, 2003 WL 25685229, at *1 n.1 (citing *14.38 Acres of Land Situated in Leflore County,* 80 F.3d at 1078). Therefore, the Court finds that the opinions of Lloyd are admissible, and Plaintiff's Motion to Exclude Expert Testimony of Terry Lloyd is denied.

C. *Defendant Double-Take Software, Inc.'s Sealed Motion to Exclude Expert Testimony of Barry L. Bell (Dkt. #44)*

Defendant asserts that the expert testimony of Plaintiff's expert witness on damages, Barry L. Bell is both irrelevant and unreliable (Dkt. #44 at 5). First, Defendant contends that Bell's testimony is irrelevant because Bell calculates a hypothetical lost license fee which is not the correct measure of damages under the Copyright Act. Further, Defendant argues that Bell's reliance on the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), is unwarranted because the factors are derived from a patent statute and not applicable to the damages calculations in this case. *Id*. Defendant also argues that Bell's expert testimony fails to address the question presented by Plaintiff's damages theory. *Id*. at 7. Defendant contends that Bell has no understanding of the difference between static and dynamic linking, which is the measure that he must quantify in order to correctly calculate the damages in this case. *Id*. Finally, Defendant argues that Bell's supplemental report is untimely and irrelevant. *Id*. at 7.

"When expert testimony has been challenged, it is incumbent upon the court to conduct a preliminary fact-finding to determine whether the expert is qualified to render the proffered opinions

and whether the substance of the testimony is both reliable and relevant." *Allison,* 2003 WL 25685229, at *1. The court must also articulate its basis for admitting expert testimony. *See Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001). To be reliable, and therefore admissible under Rule 702 of the Federal Rules of Evidence, expert testimony as to a scientific, technical or other specialized area must: (1) assist the trier of fact to understand the evidence or to determine a fact in issue; (2) be based upon sufficient facts or data; (3) be the product of reliable principles or methods; (4) and have reliably applied the principles and methods to the facts. FED. R. EVID. 702. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et. alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

Defendant argues that Bell's use of the *Georgia-Pacific* factors was inappropriate and his reliance on these factors renders his conclusions irrelevant and unreliable. A copyright owner may recover actual damages he or she suffers as a result of copyright infringement. 17 U.S.C. § 504. "Courts have construed the 'actual damages' measure to include license fees that the copyright owner would have obtained for the infringer's use of the copyrighted material." *Interplan Architects, Inc. v. Thomas*, No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306, at *35 (S.D. Tex. Oct. 27, 2010) (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 165 (2d Cir. 2001)). "Where the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are 'what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Interplan*, 2010 U.S. Dist. LEXIS 114306, at *35-36 (citing *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007)). The license fee is determined by reference to fair market value. *Interplan*, 2010 U.S. Dist. LEXIS 114306, at *36. This is an objective analysis rather than a subjective analysis

based on what the copyright owner would have charged. *Id*. "Fair market value may be established where: '(1) a plaintiff demonstrates that he previously received compensation for use of the infringed work; or (2) the plaintiff produces evidence of benchmark licenses, that is, what licensors have paid for use of similar work.'" *Id.* (citation omitted).

The actual damages in this case would be limited to the fair market value of the right to statically link the C++ Toolkits with Defendant's products. There is no dispute that Defendant was entitled to dynamically link the Toolkits under the terms of the license agreement. Bell states that in order to quantify Plaintiff's actual damages from the infringement, he analyzed the value of the software assuming that the parties entered into a hypothetical negotiation in or around November 1996 (Dkt. #44, Ex. A at 7). In order to perform the hypothetical negotiation, Bell uses the fifteen (15) factors outlined in *Georgia-Pacific*. Bell acknowledges that this is a method primarily used for the calculation of a reasonable royalty in patent infringement matters, but he also finds the *Georgia-Pacific* factors instructive in ascertaining the terms that Plaintiff and Defendant would have agreed to in the hypothetical negotiation.

There is no evidence presented regarding the actual fair market value of the right to statically link Plaintiff's C++ Toolkits, nor is there evidence that Plaintiff previously received compensation for use of the work for this purpose alone. Therefore, Plaintiff argues that Bell uses evidence of benchmark licenses entered into by Plaintiff to indicate what other licensors have paid for the use of similar work. The damages at issue in this case are limited to the fair market value of the ability to statically link the C++ Toolkits with the Defendant's product, which is a fairly narrow question. Although the *Georgia-Pacific* factors are not typically used to calculate a hypothetical lost license fee, the Court will consider Bell's analysis of these specific factors individually to determine if they

are a reliable measure of damages in this case. "The inquiry is an objective one into the resultant fair market value after negotiation between a willing buyer and seller." *Leland Medical Centers, Inc. v. Weiss*, No. 4-07-CV-67, 2007 U.S. Dist. LEXIS 76095, at *21 (E.D. Tex. 2007). It is not relevant to determine what Plaintiff would have charged, and what Defendant would have paid. *Id*. at *21-22.

Factor 1 of the *Georgia-Pacific* factors is the "royalties received by the [owner of the copyright] for the licensing of the [copyrighted work] in suit, proving or tending to prove an established royalty" (Dkt. #44, Ex. A at 8). Bell's report considers approximately ten (10) license agreements entered into by Plaintiff (Recursion and/or ObjectSpace) and other licensees of Plaintiff's various products. *Id*. at 8-13. After a review of these ten (10) license agreements, Bell determined that three agreements, the Vignette agreement, the 1997 Versant agreement, and the 2005 Versant agreement, were the most comparable license agreements to the hypothetical license agreement the parties would have negotiated. *Id*. at 13. Bell found the following:

> While these agreements appear to be more narrow in scope in some areas than Double-Take's alleged use of the Toolkits software, the terms of these agreements, including amount paid to Recursion under these agreements, provide insight into the terms under which Recursion would have agreed to license the Systems Toolkit software for Double-Take's desired scope of use.

*Id*.

However, these agreements do not appear to be comparable to the use of the C++ Toolkits made by Defendant. "[T]he fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made." *On Davis v. Gap, Inc.*, 246 F.3d 152, 166 n.5 (2d Cir. 2001). "Thus, assuming the defendant made infringing use of a Mickey Mouse image for a single performance of a school play before schoolchildren, teachers and parents with tickets at $3, the fair market value would not be the same as the fee customarily charged by the owner to license

the use of this image in a commercial production." *Id*. As an initial matter, these three agreements are license agreements that involve products that were not licensed or used by Defendant. The license agreement entered into by Plaintiff and Defendant in the present case is for the Systems Toolkit product. However, the Vignette agreement is for the Foundations Toolkit. The 1997 Versant agreement is for the Standards Toolkit, Streaming Toolkit, and Vstream. The 2005 Versant agreement is for the Standards Toolkit, Foundations Toolkit, and the Communications Toolkit. Bell does make some alteration of his calculations based on this fact; however, he adjusts his damages upward based on the prices charged by Plaintiff for the Systems Toolkit in 1997. The amount Plaintiff would have charged in 1997 for the Systems Toolkit is irrelevant when calculating the fair market value of static linking.

Further, the agreements determined by Bell to be comparable appear to grant much broader rights to use the C++ Toolkits than the actual use of the C++ Toolkits allegedly made by Defendant. Again, the limited damages inquiry in this case is the fair market value of static linking. The Court recognizes that "finding the fair market value of a reasonable license fee may involve some uncertainty." *Id*. However, in this case, Bell makes no adjustments in his calculations for the much broader rights granted in the three agreements considered in his analysis as comparable licenses. The 1997 Versant agreement grants a "non exclusive, perpetual, and non-transferable license to grant sublicenses" to the Toolkits (Dkt. #44, Ex. D at 2). The agreement further describes the conditions under which the Toolkits could be distributed using object code or source code. *Id*. In addition, the agreement allows Versant to "use, copy, modify and prepare derivative works of the Software," and the right to use Plaintiff's trademarks and marketing materials. *Id*. These rights are all beyond the use of the C++ Toolkits allegedly made by Defendant. Bell makes no adjustments in his analysis

14

for this fact.

The Vignette agreement grants to Vignette "a world-wide, nonexclusive, nontransferable... royalty-free license to reproduce, have reproduced, modify, distribute (directly or indirectly through Permitted Subdistributors, as defined below), use, have used, and sublicense the Software in conjunction with or as a part of the Licensed Product to LICENSEE Customers" (Dkt. #44, Ex. G at 2). In addition, Vignette had the ability to make unlimited copies of the software for training, trial, and evaluation purposes, to copy and include the user manuals into its own user manuals, to use, modify and distribute Plaintiff's marketing materials, and to use Plaintiff's trademarks. *Id*. These rights are all beyond the use of the C++ Toolkits allegedly made by Defendant.

Neither party provided the text of the 2005 Versant agreement as an exhibit for the Court's consideration. However, according to the summary provided by Bell:

> Per the terms of the 2005 license agreement, Recursion granted Versant a worldwide, perpetual, non-exclusive, non-transferable license to the Standards Template Library, Foundations Toolkit and Communications Toolkit for all platforms. Versant also received distribution rights, allowing it to distribute the C++ Toolkit software without a restriction to shared or dynamic linked libraries.

(Dkt. #44, Ex. A at 10). Finally, Bell acknowledges in his expert report that while "the terms of these agreements differ somewhat from the terms to which Recursion and Double-Take would have agreed in a hypothetical negotiation, they do provide useful data points to consider." *Id*. at 11. The Court is unable to determine what rights this agreement conferred at this time. However, it is clear that the terms differed in some manner from the result of the hypothetical negotiation.

The remaining factors, as they are applied by Bell in this case, are irrelevant to the calculation of actual damages in this case. Therefore, the Court finds that Bell's report is not relevant to assist the jury to determine a fact in issue. The question before the jury is the fair market value of the right

to statically link the C++ Toolkits, which is the actual alleged use of the copyrighted material made by Defendant. Bell's report does not address this question. In addition, Bell's report is not the product of reliable principles or methods because he does not use appropriate comparable license agreements to determine a hypothetical license fee. Because the reliability analysis applies to all aspects of an expert's testimony, the Court finds that the Motion to Exclude the Expert Testimony of Barry L. Bell is granted.

D. *Defendant Double-Take Software, Inc.'s Sealed Motion to Exclude Expert Testimony of Peter M. Martin (Dkt. #45)*

Defendant moves to exclude portions of the expert testimony of Peter M. Martin ("Martin"), a technical expert hired by Plaintiff to testify to the trade usage of certain technical terms used in the industry. Defendant argues that the Court should strike portions of Martin's report and testimony containing improper legal conclusions that are not appropriate for expert testimony (Dkt. #45 at 1-2).

Martin's report describes the terms "shared library" and "dynamic link library" (Dkt. #45, Ex. A). In addition, Martin provides background information regarding the format for shared libraries and industry-specific meanings of various terms found in the license agreements between the parties.

Experts cannot offer testimony regarding what law governs a dispute or what the applicable law means, because that is a function of the Court. *Fisher v. Halliburton*, No. H-05-1731, 2009 U.S. Dist. LEXIS 118486, at *14 (S.D. Tex. Dec. 21, 2009) (citing *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); see also *Goodman v. Harris Cnty*, 571 F.3d 388, 399 (5th Cir. 2009) ("An expert may never render conclusions of law."). "Allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant."

16

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). "There is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge." *Askanase*, 130 F.3d at 673. In addition, an expert should not be permitted to give opinions that reiterate what the lawyers offer in argument. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (citation omitted).

Martin's conclusions and opinions provide useful information regarding the context of the parties' contract negotiations and agreements. However, some of his opinions are improper legal conclusions, and must be excluded. Plaintiff does not need Martin's testimony to make arguments regarding the interpretation of the terms of the license. Plaintiff's counsel may make such arguments in briefs or argument before the Court. Therefore, the following portions of the Expert Report of Peter M. Martin Regarding Copyright Infringement of Recursion's Products shall be struck: (1) Page 5, Part E - Summary of My Opinions, the sentence stating, "The term 'dynamic loading' indicates that only dynamic linking was meant to be allowed"; (2) Page 9, Part F - Analysis of the Software License and Warranty Agreement in Technical Terms, Section 4, the sentences stating, "The term 'dynamic loading' indicates that only dynamic linking was meant to be allowed. It is further my opinion that ObjectSpace's references to its 'Product' are consistent with industry best practices which were emerging at the time, and which have endured. I believe that ObjectSpace was seeking a way to combine technological possibilities and the commercial interests of different enterprises"; (3) Page 12, Part G - Analysis of Double-Take's Technical Admission in Interrogatory Answers, Section 5 - Answer to Interrogatory No. 8 should be struck in its entirety; and (4) Page 12, Part G - Analysis of Double-Take's Technical Admission in Interrogatory Answers, Section 6 - Answer to Interrogatory No. 10 should be struck in its entirety.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff's Second Sealed Motion to Exclude the Expert Testimony of Judy Etchison (Dkt. #39) is DENIED.

The Court further finds that Plaintiff's Sealed Motion to Exclude Expert Testimony of Terry Lloyd (Dkt. #40) is DENIED.

The Court further finds that Defendant's Sealed Motion to Exclude Expert Testimony of Barry L. Bell (Dkt. #44) is GRANTED.

The Court further finds that Defendant's Sealed Motion to Exclude Expert Testimony of Peter M. Martin (Dkt. #45) is GRANTED in part, and DENIED in part.

**It is SO ORDERED.**
**SIGNED this 4th day of May, 2012.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE